**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| AL'SHAMOON THOMPSON, | : | |
| | : | Civil Action No. 12-4830 (CCC) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CHARLES WARREN, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

**CECCHI, District Judge**.

## I.   INTRODUCTION

Before the Court is the Amended Petition for a writ of habeas corpus of Petitioner Al'Shamoon Thompson ("Petitioner" or "Al'Shamoon") brought pursuant to 28 U.S.C. § 2254. ECF No. 6. For the reasons set forth below, Petitioner's habeas petition is denied, and Petitioner is denied a certificate of appealability.

## II.   BACKGROUND

### A.   Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division, issued on Petitioner's direct appeal:

> The facts of the case, reduced to their essence, are as follows. On the morning of November 14, 1995, Kenya Johns and her husband Leeman Hicks were lying in bed in their Newark, New Jersey, apartment when there was a knock on the door. Hicks admitted his friend Moon (defendant Alshamoon Thompson), who Johns knew very well, into the apartment. Johns stayed in the bed while defendant and Hicks conversed in the living room. After a short time, Johns heard footsteps in the hall. She looked up from the bed and Hicks was at the bedroom door; defendant was behind him and slightly to the side. Defendant had a gun in his left hand pointed up

1

towards Hick's head and a gun with a silencer in his right hand pointed down towards Johns. Johns testified that she "saw stars" and "everything went black"; she did not remember being shot, but was bleeding from a head wound. When she regained consciousness, she could see Hicks lying on the floor in the hall. He was dead, killed by a gunshot to the back of his head. Johns called for help and as soon as her sister [Nyeshia Johns]'s boyfriend [Timothy Wright] arrived she told him that "Moon" did it. She repeated this claim to Detective Jack Eutsey who was at the scene. The day after the shootings, and after she had undergone brain surgery, Johns identified defendant in a photo lineup. Defendant did not testify or produce witnesses at trial. On this evidence, he was convicted.

ECF No. 59-6 at 3–4.

Additional facts were cited by the Superior Court of New Jersey in denying post-conviction relief ("PCR"), after the case was remanded by the Appellate Division:

> During Ms. John's hospitalization, a blood test was ordered which showed an unspecified quantity of the following in her system: barbiturates, benzodiazepine and opiates. On the first day of trial, during an argument on the admissibility of the test results, the State incorrectly referred to the result as having come from a urine test, an error repeated in the Appellate Division's opinion on the direct appeal.

ECF No. 59-14 at 3.

## B. Procedural History

Following a jury trial, Petitioner was convicted of:

> [F]irst-degree purposeful and knowing murder of Leeman Bernard Hicks, first-degree attempted murder of Kenya Johns, second-degree aggravated assault of Johns, third-degree unlawful possession of a handgun, second-degree possession of a handgun for an unlawful purpose, and fourth-degree possession of a silencer.
>
> . . .
>
> [t]he aggregate sentence [was] life in prison plus twenty-five years with a forty-year period of parole ineligibility.

*State v. Thompson*, No. A-2582-09T2, 2011 WL 2694456, at *1 (N.J. Super. Ct. App. Div. July

13, 2011) (quotation marks and citation omitted).

Petitioner appealed his conviction and sentence. The Appellate Division affirmed his conviction on June 23, 1999. ECF No. 59-6. The New Jersey Supreme Court denied certification on October 26, 1999. ECF No. 59-7. Petitioner filed a petition for PCR, which was denied by the Superior Court of New Jersey, Law Division, on June 26, 2006. ECF No. 59-9. Petitioner filed a motion for reconsideration which was denied on November 9, 2006. ECF No. 59-11. Petitioner appealed, and on February 6, 2009, the Appellate Division reversed and remanded to the Law Division, to hold an evidentiary hearing on Petitioner's ineffective assistance of counsel claims. *State v. Thompson*, 963 A.2d 884, 890 (N.J. Super. Ct. App. Div. 2009). The Law Division denied relief on July 30, 2009. ECF No. 59-15. Petitioner filed a second petition for PCR ("Second PCR Petition"), or, in the alternative, a motion for reconsideration, which the Law Division denied on November 2, 2009.[1] ECF No. 59-17. Petitioner appealed, and on July 13, 2011, the Appellate Division affirmed the denial. ECF No. 59-19. The Supreme Court of New Jersey denied certification on February 2, 2012. ECF No. 59-25. On or about August 10, 2012, Petitioner filed a habeas petition with this Court. ECF No. 1. Petitioner filed an Amended Petition on or about December 12, 2012, raising three grounds for relief:

1. [Counsel's f]ailure to object to the State's incorrect identification of a key lab test result of it's [sic] Chief witness Kenya Johns.

2. [Counsel's f]ailure to request a *Wade* hearing in the face of serious questions regarding Kenya Johns and Timothy Wright in-court and out-of court identification and the suggestive circumstances which surrounded their identification.

---

[1] The opinion of the PCR court states: "[t]his matter comes before the Court by way of a second motion for Post-Conviction Relief . . . filed by pro se defendant. This PCR was captioned as a 'Motion for Reconsideration.' However, the main argument is trial counsel and PCR counsel (from the first PCR), were ineffective. Therefore, it raises new issues and should be treated as a second PCR." ECF No. 59-17 at 2.

3. Trial counsel failed to object and/or move for [a] mistrial after the state violated the rules of disclosure [twice] by failing to turn over a telephone bill provided to her by Johns; and failure to notify the defense that Johns told the prosecutor twice that she did not use any drugs one would consider "street" drugs.

ECF No. 6.

The Court dismissed the Petition as time-barred. ECF Nos. 17, 18. Petitioner filed a Motion for Reconsideration, which the Court denied. ECF No. 42. Petitioner appealed to the Third Circuit Court of Appeals. On June 23, 2017, the Third Circuit reversed this Court's August 10, 2012 judgment, finding the petition was not time-barred, and remanded this matter for further proceedings. ECF No. 51. On July 19, 2017, this Court issued an Order reopening the action in accordance with the mandate of the Third Circuit, (ECF No. 53), and Respondents were required to file a Supplemental Response (ECF No. 58). In their Supplemental Response, Respondents argue that Petitioner's claims are meritless. ECF No. 59. Petitioner submitted a Supplemental Reply and additional correspondence. ECF Nos. 66–67, 69.

## III.  **LEGAL STANDARD**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, 567 U.S. 37, 40–41 (2012). District courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall

not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Federal law is established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Under these standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008). These standards apply "even where there has been a summary denial" by the state court. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under section 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). To

the extent that a petitioner's constitutional claims are unexhausted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005).

## IV. <u>DISCUSSION</u>

Petitioner's three grounds for relief relate to the alleged ineffective assistance of his trial and appellate counsel. The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. *Id.* at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The court must then determine whether, in light of all the circumstances at the time, the identified errors fell "below an objective standard of reasonableness." *Hinton v. Alabama*, 571 U.S. 263, 264 (2014).

Second, a petitioner must establish that counsel's "deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 669. To establish prejudice, the defendant must show that "there is a reasonable probability that the result of trial would have been different absent the deficient act or omission." *Id.* at 1083. On habeas review, it is not enough that a federal judge would have found counsel ineffective. The judge must find that the state court's resolution of the issue was unreasonable, a higher standard. *Harrington v. Richter*,

562 U.S. 86, 101 (2011).

**A. Ground One**: **Failure to Retain an Expert**

Petitioner alleges that his trial counsel was ineffective for failing to retain an expert to identify the source of drugs discovered in Kenya Johns' ("Kenya" or "Johns") system. ECF No. 6 at 11. He explains that during a pretrial conference, his attorney sought to question Johns regarding the presence of drugs in her system, which were discovered in Johns' hospital records. Id. In response, the prosecutor successfully argued that because the drugs were found in Johns' urine, as opposed to her blood, facts relating to her drug-use were not reliable. Id. Years later, it was ultimately revealed that the drugs were found in Johns' blood. Id. Petitioner's trial and appellate attorneys failed to discover the inaccuracy. Id. at 12.

In essence, Petitioner appears to raise, together, two claims of ineffective assistance of counsel: (1) that his counsel was ineffective in failing to retain an expert; and (2) that his counsel was ineffective in failing to discover that the drugs were in Johns' blood. The Appellate Division, in affirming the denial of PCR after the remand, denied these claims as follows:

> [This] matter came before a newly assigned PCR judge, who decided the remand without a hearing in a written decision dated July 30, 2009. By then, defendant had procured a report from Dr. Daniel P. Greenfield, who specialized in general and forensic psychiatry and addiction medicine. He opined on the issue of whether "benzodiazepines, barbiturates, and opioids contributed sufficiently to [Johns's] mental state and psychiatric/neuropsychiatric/addiction medicine condition at the time to have impeded or otherwise significantly affected her ability . . . to have identified [defendant] as the shooter of her deceased husband . . . and herself."
>
> Among the documents he reviewed were statements from two EMS workers at the scene of the shooting where they heard Johns identify "Moon" as the shooter. He also reviewed a statement from a witness who arrived at the scene before the police and to whom Johns stated, "'Moon did, Moon did it.'" He considered a photographic identification signed by Johns stating that "'the guy who shot me

and Salaam. His name is Moon. He escape [sic] out of Northern State.'" He reviewed police reports describing Johns's condition at the time as "conscious responsive." He noted Johns's written statement ten days after the shooting in which she gave a lengthy account of the shooting. Additionally, he reviewed the grand jury proceedings at which Johns testified and gave a consistent identification of defendant as the shooter. Further, he considered medical records, including a MICU Medical Incident Report Form describing Johns's condition on first examination as "'conscious/lethargic.'" Her medical records from November 14 to 23, 1995, revealed a therapeutic level of Dilantin for seizures and positive test results at 12:13 p.m. on November 14, 1995, for barbiturates, benzodiazepines, and opiates without any quantitative assessment[,] whereas a test done at 12:08 p.m. was negative. He did note that there was no other mention in the hospital records of these agents, "leaving an open question concerning her licit or illicit use of these agents leading up to the time of the shooting."

Dr. Greenfield thoroughly discussed his findings and reached the following opinion:

> In summary, it is my psychiatric/neuro-psychiatric/addition medicine/toxicologic opinion . . . that the toxicologic (and other clinical) information obtainable from the laboratory chemistry tests on [Johns] on her admission to University Hospital on November 14, 1995, . . . do not permit inferences with a degree of reasonable medical probability one way or another about the potential cognitive impairing effects which representatives of those three agents of psychoactive medications and/or drugs may have had on [Johns] at the time in connection with her identification of [defendant] as the shooter in this incident, an identification which was made by her very shortly after the actual shooting. On the other hand, [Johns's] accurate identification of [defendant] as the shooter is consistent with her [inferable] mental state at the time (including potential effects of benzodiazepines, barbiturates, or opioids, and of the impact of the gunshot wound on her brain), which does not begin to be become altered . . . until sometime[] after that identification has been made.

> Finally, . . . it is also my professional opinion . . . that even if expert evaluation and testimony had been

obtained at the time of the original litigation and trial in this matter, that evaluation and testimony would not likely have been relevant to the outcome in this matter, in that it would likely have supported the inferences and opinions expressed above in this present report.

The State, too, obtained a medical report from Dr. Azuriah Eshkenazi, who, quite succinctly, "completely agree[d] with Dr. Greenfield's opinion" and expressed that "there is no way that one could come to a conclusion that the witness was intoxicated and could not have recognized [defendant]."

In her July 30, 2009, written decision, the PCR judge recited the findings of both experts and explained that, "[i]n light of these reports, and the absolute death knell even the defense expert's report sounded to the last defense theory, the defense was given yet another opportunity to provide anything else to supplement its position before this remand was resolved on the papers" but forwarded only his client's written objection to his own expert report, and neither counsel requested oral argument.

The judge then considered defendant's written objection that his trial and appellate counsel were ineffective because they failed to notice the State's error in identifying the tests as based on urine, not blood, trial counsel's failure to elicit facts upon which a favorable expert opinion could have been based, and appellate counsel's failure to raise the issue. She then applied *Strickland*'s test to determine ineffective assistance of counsel and concluded that defendant had failed to prove the second prong of *Strickland*, prejudice from counsel's ineffective representation, because the blood test simply did not have enough information on which to base an attack on Johns's credibility. She concluded that defendant's written objection "does not raise any issues of merit."

. . .

In *Strickland*, *supra*, 466 U.S. at 685, 104 S. Ct. at 2063, 80 L. Ed. 2d at 692, the United States Supreme Court explained the constitutional guarantee of effective assistance of counsel for every criminal defendant embodied in the Sixth Amendment. A two-prong analysis is required when evaluating a claim of ineffective assistance of counsel. *Id*. at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693. To prevail, the defendant must first demonstrate that trial counsel committed serious professional errors. *Ibid*. Second, the

defendant must demonstrate that the professional errors were so prejudicial as to deprive him of a fair trial. *Ibid*. Our Supreme Court has adopted the standards embodied in *Strickland*. *State v. Fritz*, 105 N.J. 42, 57-58 (1987).

Once both experts opined that no conclusions could be drawn from the hospital records about Johns's ability or inability to accurately identify defendant, defendant was no longer able to prove that his counsel was ineffective in failing to secure expert testimony because he suffered no prejudice from that failure.

ECF No. 59-19 at 11–14, 18.

The Appellate Division's reasoning does not amount to an unreasonable application of the *Strickland* standard. As indicated above, separate experts for the defense and the State both agreed that no expert could testify with a degree of reasonable medical probability that the drugs in Johns' system affected her ability to identify Petitioner. Indeed, the defense's own medical expert indicated that this same conclusion would have been reached had an expert been obtained at trial. Thus, under the heightened AEDPA standard, this Court does not find the Appellate Division's resolution of this matter to be unreasonable. *See Harrington*, 562 U.S. at 101.

In his Supplemental Reply, Petitioner argues that *Strickland* requires a court to consider the reasonableness of counsel's challenged conduct "as of the time of counsel's conduct." ECF No. 66 at 12 (citing *Strickland*, 466 U.S. at 690). Thus, Petitioner avers that an expert obtained years after trial simply cannot opine about what would have occurred at the time of trial. Petitioner also argues that he was prejudiced under *Strickland* because he was deprived of the opportunity to question Kenya Johns about her drug-use, and place her credibility into question. *Id.* at 10.

With respect to his first argument, even if counsel's actions, judged at the time of trial, were unreasonable, Petitioner still fails to demonstrate that the state court's decision under the prejudice prong of *Strickland* was unreasonable. Under this prong, it is Petitioner's burden to establish a "reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner has not met his burden. As the Appellate Division makes clear, the opinion of the defense's expert lends significant weight to the conclusion that no prejudice ensued from counsel's failure to retain an expert at trial. Thus, while counsel could have chosen to have obtained an expert at trial, or to have questioned Johns about her possible drug use, that is insufficient to demonstrate prejudice under *Strickland*. For these reasons, Petitioner fails to persuade this Court that the state court's decision denying this claim was an unreasonable application of Supreme Court precedent. Accordingly, the Court denies habeas relief on Ground One.

### B. Ground Two: Failure to Request a *Wade* Hearing

In Ground Two, Petitioner alleges that his trial counsel was ineffective in failing to request a *Wade* hearing.[2] He explains that Johns' description of the shooter to the police differed from her description at trial, and was considerably different from the description of Petitioner's appearance in the police report. ECF No. 6 at 12. He also argues that his counsel failed to object to the unnecessarily suggestive nature of the photo array conducted. Id. at 13. Petitioner explains that his photo was specifically placed in the six-person photo array, because there was a nation-wide search for him relating to a separate killing of a New Jersey Corrections Officer. Id. He also asserts that Johns may have viewed Timothy Wright's signatures on the back of the photograph. Id.

As an initial matter, it is not entirely clear to the Court whether these claims were properly exhausted in state court. Petitioner asserts that his public defender never appealed the denial of

---

[2] "The purpose of a *Wade* hearing is to determine whether identification testimony should be suppressed because the manner in which the identification of the suspect was obtained was unduly suggestive." *Herrill v. Ricci*, No. 10-3575, 2016 WL 1183176, at *18 (D.N.J. Mar. 28, 2016) (citing *United States v. Wade*, 388 U.S. 218, 242 (1967)). "The hearing is made outside the presence of a jury, and concerns not the in-court identification, but only the pre-trial identification." *United States v. Stevens*, 935 F.2d 1380, 1386 (3d Cir. 1991) (citation omitted).

his Second PCR Petition, where these claims were raised, and therefore the Appellate Division never had occasion to review the claims raised therein.[3] To the extent that is the case, because this Court's *de novo* review applies a more liberal standard in favor of Petitioner than AEDPA deference, the Court finds Petitioner's claims fail under either standard. *See Harrington,* 562 U.S. at 101.

The PCR court, in denying Petitioner's Second PCR Petition, addressed the inconsistencies in Johns' identification as follows:[4]

> Defendant argues that his prior counsel failed to request a *Wade* hearing, *United States v. Wade*, 388 U.S. 218 (1967), challenging the victim's identification of him. He states his conviction is therefore not supported by the trial record. Defendant alleges that trial, appellate and PCR counsel were ineffective because they failed to raise the issue of identification of defendant by the surviving shooting victim [Kenya Johns]. Specifically, defendant points to inconsistencies he perceived in her testimony, and argues trial counsel, appellate counsel and PCR counsel were all ineffective in failing to pursue [h]is right to suppress the victim's out of court identification.
>
> All of the alleged inconsistencies in the witness's description of defendant were fully explored at trial. On cross-examination [Kenya Johns] was questioned extensively about her descriptions of clothing, skin color, height, and weight; all the issues defendant now argues. Under the facts of this case, a *Wade* motion was completely inappropriate. The victim testified she knew defendant for some time before the shooting, had the occasion to observe him numerous times before, and had spoken to him many times. She testified she saw him come into the apartment, heard him greeted by name and in short, he was a person "who Johns knew very well." *State v. Thompson*, A-406-97 (App. Div. June 23, 1999), *certif. denied*, 162 N.J. 199 (1999). Defendant has provided no basis to suggest a *Wade* hearing was appropriate. Failing to file a motion that has no legal

---

[3] To the extent this claim is not fully exhausted, it is dismissed on the merits under 28 U.S.C. § 2254(b)(2). In the alternative, because these claims also appear to have been raised in Petitioner's motion for reconsideration of the denial of PCR before the remand, and were listed by the Appellate Division in its opinion affirming the denial of PCR after the remand, they may be properly exhausted. *See* ECF No. 59-19.

[4] The Court cites to the PCR opinion to provide context and background to this claim.

> basis in law or fact does not meet the *Strickland/Fritz* test.
>
> Defendant has not met the standard for ineffective assistance of counsel as articulated in *Fritz*, *supra*, 105 N.J. 42.

ECF No. 59-17 at 4–5.

The Supreme Court set forth the standard which governs the admissibility of an out of court identification in *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). Pursuant to *Manson*, an identification procedure violates due process and the identification at issue is inadmissible where the procedure used was "unnecessarily suggestive and . . . create[d] a substantial risk of misidentification." *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006).

A *Wade* hearing is not required in every case in which a defendant challenges out of court identifications. *See Watkins v. Sowders*, 449 U.S. 341, 349 (1981). Instead, under *Strickland*, for a petitioner to demonstrate that he was prejudiced by counsel's failure to seek a *Wade* hearing, a petitioner "must show that he would likely have prevailed on [his] suppression motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted." *Thomas v. Varner*, 428 F.3d 491, 502 (3d Cir. 2005).

Petitioner has failed to present sufficient evidence to suggest that he would have prevailed on his suppression motion, and, therefore, his argument fails under *Strickland*. Contrary to Petitioner's claims, the record makes it abundantly clear that Johns was intimately familiar with Petitioner and had ample opportunity to view Petitioner both before and during the murder. On direct examination, Johns described seeing Petitioner on the street numerous times, talking to him on the phone, and meeting Petitioner in her apartment on two occasions prior to the murder. On the first occasion Petitioner stayed for "[a]round 30 minutes. . . [and t]he second time he was there maybe like an hour cause we watched a movie together, we was eating crabs and drinking beer. . . . I always see him like in front of the building or like down the street walking past." *See* ECF No.

59-31 at 25. Johns testified at trial that it was "Alshamoon" who came into the apartment on the day of the shooting. Id. at 24–25. While Johns also testified that Petitioner looked different from when she had seen him on prior occasions: "[l]ike he was about maybe 160 pounds. He was like dark skinned. He just didn't look like the same Alshamoon I met when he first -- when I first met him, he looked different[,]" Johns never indicated she was anything but certain that Petitioner was the shooter.

Further, the record reveals that trial counsel thoroughly cross-examined Johns about discrepancies in her initial statement to police describing Petitioner's clothing, and her contrasting testimony at trial. *See, e.g.*, ECF No. 59-32 at 6. Counsel also directly questioned Johns about the changes in Petitioner's appearance. Id. at 8. On summation, trial counsel alluded to the many inconsistencies in Johns' trial testimony, grand jury testimony, and sworn statement to the police. ECF No. 59-35 at 10. While Petitioner may have preferred for counsel to object before trial, there is nothing to indicate that Petitioner would have prevailed had a *Wade* hearing been conducted. Accordingly, habeas relief is denied on this claim.

There is also nothing to indicate that the photo array was unduly suggestive. The Supreme Court held in *Simmons v. United States*, 390 U.S. 377 (1968) that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384.

The Court of Appeals for the Third Circuit has explained that the *Simmons*

> inquiry is essentially two-pronged. The first question is whether the
> initial identification procedure was "unnecessarily" or
> "impermissibly" suggestive. This inquiry actually contains two
> component parts: "that concerning the suggestiveness of the
> identification, and that concerning *whether there was some good
> reason for the failure to resort to less suggestive procedures*. If a

> procedure is found to have been unnecessarily suggestive, the next question is whether the procedure was so "conducive to . . . mistaken identification" or gave rise to such a "substantial likelihood of . . . misidentification" that admitting the identification would be a denial of due process.

*United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir.1991) (internal citations omitted) (emphasis in original). "The suggestiveness of a photographic array depends on several factors, including the size of the array, its manner of presentation, and its contents. If there is no prejudice in the manner of presentation, the primary question is whether the suspect's picture is so different from the rest that it suggests culpability." *Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991) superseded on other grounds by 28 U.S.C. § 2254(d).

Detective Sheppard took a statement from Timothy Wright after the shooting, in which Wright explained that Kenya told him Moon was the shooter.[5] ECF No. 59-32 at 22; ECF No. 59-33 at 21. While taking the statement, Detective Sheppard had a conversation with Detective Eutsey who advised him that Kenya told Detective Eutsey that "Moon" was the shooter. ECF No. 59-32 at 22–23. As a result, Detective Sheppard, who was familiar with Al'shamoon, placed a photograph of Al'shamoon in the photo array. Id. Detective Sheppard summarized his conversation with Wright as follows: "I was going to show him the photo array consisting of six black males in a sequential order through 6. [L]ook at the photo array. [T]ell me if you recognize anyone in the array." Id. Wright then "identified the black male and went to number two as being the person Moon. He signed the rear of the photo that he identified. He also initialed the other 5 photos he didn't identify." Id. Detective Sheppard testified that no one told Wright to pick out any photo and Wright was "positive" that the individual in photo number 2 was "Moon." Id. at 24.

---

[5] At the time Detective Sheppard took the statement, Timothy Wright used the alias Tim Gresham. It was later revealed that the individual's name was in fact Timothy Wright. ECF No. 59-33 at 23.

Detective Sheppard also testified that Wright was not an eyewitness in the case, but because Wright was familiar with Moon, Wright was used to identify Al'shamoon Thompson. Id. at 23–24.

On November 15th, the day after the shooting, Detective Sheppard went to see Johns in the hospital "to show her the photo array." ECF No. 59-32 at 24. Johns was shown the same photo array that Wright was shown. Id. "I advised her I was going to show her a color photo array of six black makes consisting of -- I'm sorry. In the sequential order one through 6. I asked her to look at the array and tell me if she recognizes anyone." Id. "She immediately pointed to number two as being the person Moon that shot her and her husband . . . ." Id. Johns then signed "the front portion, right underneath the photo." Id. On direct examination, Johns testified that the "mug shots . . . were stapled to a folder." ECF No. 59-31 at 35. Johns further testified that she had no occasion to look at the other side of the photos or inside the file, that she was told nothing about the photographs, and was certain, within seconds, that the individual she saw in photo number two was the shooter. ECF No. 59-31 at 35–36. Similarly, Timothy Wright testified that Detective Sheppard showed him photographs, he identified number two as "Moon," signed the back, and initialed the back of the other photos. ECF No. 59-33 at 22.

These facts alone fail to demonstrate that the photo array was unnecessarily suggestive. The testimony at trial reveals that the photographs were stapled to a folder, and that Johns only saw the front of the photographs and did not have occasion to see Timothy Wright's signature on the back. Petitioner's purely speculative allegation contradicts the testimony at trial, and thus fails to establish that the photo array was unnecessarily suggestive.

There is also nothing to suggest that Petitioner's photo set him apart from the other photos, or that either witness identified Petitioner because of any suggestive behavior or statement by Detective Sheppard. Because there is nothing *per se* improper about placing a specific suspect in

a photo array, Petitioner has failed to meet his burden in establishing that his counsel was ineffective within the meaning of *Strickland. See United States v. Foote*, 432 F. App'x 151, 153 (3d Cir. 2011) (finding nothing unduly suggestive in "photo array contain[ing] six photos, with [suspect's] photo situated in the middle of the top row . . ."). As such, Petitioner is denied relief on Ground Two.

### C. Ground Three: Failure to Disclose Evidence

In Ground Three, Petitioner avers that his trial counsel was ineffective in failing to object to and/or move for a mistrial based on the State's failure to disclose evidence. ECF No. 6 at 14–16. Petitioner explains that the State failed to turn over to the defense certain telephone records. Id. He also asserts that his trial and appellate counsel were ineffective in failing to raise the issue of Johns' drug use, which likely impaired her ability to perceive the events during and leading up to the shooting. Id. Similar to Ground Two, it is not clear to the Court if the first half of this claim relating to the phone records has been exhausted. Irrespective of exhaustion, the Court denies the claim on the merits pursuant to 28 U.S.C. § 2254(b)(2). *See Horn*, 504 F.3d at 427.

The PCR court, in denying Petitioner's motion for reconsideration after the remand, denied Petitioner's claim relating to the telephone records as follows:[6]

> Defendant complains that his trial counsel failed to object to the introduction of a telephone record of Kenya Johns, and that appellate and PCR counsel failed to address this issue. Ms. Johns had testified that she had blocked calls from the defendant during the time period leading up to the shootings. The telephone record was old, and corroborated her testimony only to the extent that it showed she had such a blocking option in her package of services. Defense counsel did not object to their admission although they were produced late.
>
> The introduction of the record corroborated, in part, a small aspect of the victim's testimony. The evidence came in anyway in the form

---

[6] Once again, the Court cites to the PCR opinion because it provides useful context.

> of direct testimony. The issue was not even important much less critical to the theory of the defense, which was mistaken identi[t]y. The issue is so completely without merit that it fails both prongs of the *Strickland/Fritz* test.

ECF No. 59-17 at 4.

By way of background, on direct examination, the State questioned Nyeshia Johns, Kenya Johns' sister, about calls Kenya had been receiving from an individual named Moon. ECF No. 59-31 at 18–19. Nyeshia testified that a few days prior to the shooting, she was visiting Johns and the phone rang about ten times. Kenya asked Nyeshia how to block certain numbers, and Nyeshia responded that she should dial *60. Id. On cross-examination, Nyeshia testified that her sister had a phone package which presumably allowed her to dial *60. Id. at 20. Later on at trial, the State informed the trial judge that it had received a phone bill from Kenya dated October 2, 1995, but failed to turn it over to the defense because it did not relate to the date of the shooting. Id. at 28. The judge, at the time, explained that he would not have allowed the phone record into evidence, because it had "no probative value." Id. at 29. At the conclusion of trial, however, the State moved two phone bills into evidence, without objection by defense counsel. ECF No. 59-35 at 4. On summation, the State referred to the phone bills as evidence of Petitioner's motive in the shooting: "[l]adies and gentleman, we've been able to [locate] some of the phone bills around that time and one of those phone bills will show you that she did, in fact have that star 60." ECF No. 59-35 at 15. The State continued:

> Now Mr. Feinberg [trial counsel] didn't talk to you about that phone call aspect and that's because it's a very important piece of evidence, ladies and gentleman. The person who came into the apartment was the same person who's [sic] calls were being blocked out. Now the only person who we know about that she blocked the calls out was Alshamoon Thompson.

ECF No. 59-35 at 15. The State proceeded to argue that Al'shamoon felt insulted that his calls

were blocked and was forced to come to the apartment in person to speak with Hicks. Id.

To the extent Petitioner attempts to assert that his counsel was ineffective under *Brady v. Maryland*, 373 U.S. 83 (1963) that claim fails. Under *Brady*, the State bears an "affirmative duty to disclose [material] evidence favorable to a defendant." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (citing *Brady*, 373 U.S. 83.) In *Strickler v. Greene*, the Supreme Court clarified that "[t]here are three components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. 263, 281–82 (1999). In this instance, the Court cannot perceive of how the phone records were favorable to Petitioner.

In addition, Petitioner fails to demonstrate that he was prejudiced by the phone bills being admitted into evidence. The testimony of Nyeshia and Kenya both referred to the numerous calls received from Moon prior to the shooting, and Kenya's desire to block his calls. The records of the two phone bills merely helped corroborate that testimony, but the testimony itself had already been presented to the jury. Thus, even had the phone records not been admitted into evidence, the testimony relating to the blocked calls would still be before the jury. Because Petitioner has failed to prove that he was prejudiced by the phone records, he cannot prevail on his claim under *Strickland*.

Moreover, insofar as Petitioner has failed to demonstrate his trial counsel was ineffective on this matter, appellate counsel cannot be deemed ineffective for failing to raise this claim. *See United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000) (explaining that if an underlying claim "is not meritorious . . . defendants cannot successfully argue that counsel's failure to raise the claim on direct appeal denied them their constitutional right of representation"); *Moore v. Mitchell*, 708

F.3d 760, 776 (6th Cir. 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit"). Accordingly, this claim for habeas relief is denied.

Petitioner also argues that his counsel was ineffective in failing to raise the issue of Johns' drug use, which likely impaired her ability to perceive the events during and leading up to the shooting. This claim appears identical to the claim raised by Petitioner in Ground One, and the Court will not revisit it in full here. Thus, in essence, Petitioner is reasserting his previous argument—that counsel was ineffective for failing to discover that the drugs were in Johns' blood, which, in turn, may have led him to question John about her drug-use at trial. Even assuming, *arguendo*, that counsel may have been unreasonable in failing to discover this issue, the Appellate Division's decision to deny this claim under the prejudice prong of *Strickland* was not. Even had counsel been able to retain an expert to prove that there were drugs in Johns' system at the time of the shooting, that is still insufficient to prove that the outcome of the case would have been different. The record establishes that Johns' credibility and perception of the events were repeatedly called into question by counsel. Nevertheless, the jury still found Petitioner guilty. The Court is not convinced that additional questioning about Johns' possible drug use would have changed the outcome of the case. Accordingly, Petitioner is denied habeas relief on Ground Three.

### D. Ineffective Assistance of PCR and Appellate Counsel

Petitioner also contends that his PCR counsel was ineffective in waiving many of Petitioner's ineffective assistance of counsel claims and for failing to obtain a second expert opinion. [7] ECF No. 6 at 17–19. Petitioner also argues that his appellate counsel was ineffective in

---

[7] Petitioner addresses this argument on a separate page following the space allocated for Ground Four.

"abandoning Petitioner during his [PCR] appeal by refusing to communicate with him. . ." Id. [8]

The Court first notes that federal law generally prohibits ineffective assistance of PCR counsel claims in a federal habeas petition. *See Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("[A] petitioner cannot claim constitutionally ineffective assistance of counsel in [state post-conviction] proceedings."); *McCendon v. Davis*, No. 19-18811, 2020 WL 6042281, at *4 (D.N.J. Oct. 13, 2020) ("[I]neffective assistance of PCR counsel is not a cognizable habeas claim."); 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). This principle has been repeatedly followed by the Third Circuit. *See Gonzalez v. Superintendent Graterford Sci*, 655 F. App'x 96, 102 n.8 (3d Cir. 2016) (quoting *Coleman*, 501 U.S. at 755) ("As the Supreme Court explained in *Coleman*, 'counsel's ineffectiveness will constitute cause only if it is an independent constitutional violation,' and 'there is no constitutional right to counsel in state collateral proceedings.'"); *United States v. Doe*, 810 F.3d 132, 154 (3d Cir. 2015) ("We also point out that, to the extent [defendant] argues that ineffectiveness of collateral-review counsel can be an independent Sixth Amendment violation . . . this claim is a nonstarter.").

Further, because Petitioner fails to provide adequate facts or persuasive arguments relating

---

[8] In connection with these contentions, Petitioner also asks the Court to consider all of the arguments made in prior briefing. ECF No. 6 at 19. Pursuant to Rules 2(c)(1) and 2(c)(2) of the Rules Governing Section 2254 Cases, "[t]he petition must . . . specify all grounds for relief available to the petitioner [and] state the facts supporting each ground" for relief. While this pro se pleading must be construed liberally, "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005); *see also Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (summary disposition of habeas petition appropriate where allegations are vague or conclusory: "the petition is expected to state facts that point to a real possibility of constitutional error").

to his additional claims of ineffective assistance of counsel by PCR and appellate counsel, he has not shown that their determinations regarding which claims to raise were objectively unreasonable or that he was prejudiced by counsels' actions. *See Buehl v. Vaughn*, 166 F.3d 163, 174 (3d Cir. 1999) (explaining that counsel cannot be deemed ineffective for failing to raise an issue that would not have resulted in the reversal of his client's conviction); *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996) ("[I]t is a well established principle that counsel decides which issues to pursue on appeal."). For these reasons, the Court denies these additional claims.

## V.    CERTIFICATE OF APPEALABILITY

Under 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason would not disagree with this Court's conclusion that Petitioner has failed to make a substantial showing of the denial of a constitutional right, Petitioner's habeas petition is inadequate to deserve encouragement to proceed further and a certificate of appealability is denied.

## VI.    CONCLUSION

For the reasons stated above, Petitioner's Amended Petition for habeas relief (ECF No. 6) is **DENIED** and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

**DATE**: May 26, 2021

_____
**CLAIRE C. CECCHI, U.S.D.J.**